UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TONYA DAVIS, as personal
representative of the Estate of
Jewronvis Davis,

       Plaintiff,

v.                                                                    Case No. 2:19-cv-750-JLB-MRM

CARMINE MARCENO, in his official
capacity as Sheriff of Lee County,
Florida, MAZIR TIBAI, individually,
SAMANTHA HUTTO, individually, and
DIANE E. CINCOTTI, individually,

       Defendants.

_____/

## ORDER

Jewronvis Davis tragically passed away following his detention in the Lee

County Jail, a facility where medical services were provided by Armor Correctional

Health ("Armor").   Plaintiff Tonya Davis, as personal representative of Mr. Davis's

estate ("the Estate"), now sues Defendant Carmine Marceno in his official capacity

as Sheriff of Lee County, and Defendants Diane Cincotti, RN, Deputy Mazir Tibai,

and Deputy Samantha Hutto in their individual capacities.   The Estate brings

claims asserting violations of 42 U.S.C. § 1983 based on deliberate indifference to

Mr. Davis's medical needs and negligence under Florida law.   Defendants have

moved for summary judgment (Doc. 82), and the Estate has responded in opposition

(Doc. 91).   After careful review of the pleadings, exhibits, and the entire record

before the Court, the Court grants summary judgment in favor of Defendants.

## BACKGROUND[1]

On October 5, 2017, Mr. Davis was arrested by the Lee County Sheriff's Office ("LCSO") and was booked into custody at the Lee County Jail.   (Doc. 50 at 3, ¶ 16.)   Mr. Davis was a double amputee, required the use of a wheelchair to ambulate, and suffered from end stage kidney disease, diabetes, and high blood pressure.   (Id. at 3, ¶¶ 18–19.)   Because of his end stage kidney disease, he was required to undergo dialysis several times a week for several hours at a time.   (Id. at 4, ¶ 20.)   Mr. Davis was also placed on the medical floor of the jail's Core Facility.   (Doc. 85-1 at 20; Doc. 86-1 at 19.)   During intake, "certain things [are] filled out, and then there's a chart made," which lists "health concerns each inmate has."   (Doc. 85-1 at 12.)   The chart is accessible to medical personnel.   (Id.)

On the night of October 17, 2017, the day before he died, Mr. Davis was in the infirmary.   (Doc. 85-1 at 16–17.)   No physicians were on duty that night at the Core Facility.   (Id. at 15.)   Nurse Cincotti was a charge nurse for Armor at the Core Facility and was working the night shift.   (Id. at 7–8.)   As charge nurse, she was responsible for the care of every inmate in custody in the Core Facility.   (Id. at 9.)   Prior to October 17, 2017, Nurse Cincotti had no interactions with Mr. Davis. (Id. at 15.)   That night, however, she had several interactions with Mr. Davis because he complained of not feeling well.   (Id. at 17.)

---

[1] The facts included in this section come mainly from the deposition testimony of Nurse Cincotti and Deputy Tibai.   Some allegations in the Estate's unsworn second amended complaint are also included for background purposes.   Such facts are undisputed and, in any event, do not affect the disposition of Defendants' motion.

Nurse Cincotti recalls that, based on his medical records, Mr. Davis had kidney disease and was a dialysis patient.  (Id. at 18–19.)   She also recalls that during her interactions with Mr. Davis on October 17, 2017, her licensed practical nurses checked his blood pressure, which was "a little low."   (Id. at 18–19.) Further, she was aware that during her lunch break Mr. Davis was found lying on the floor next to his bed.  (Id. at 26–27.)   Mr. Davis's bunkmate also commented to her about Mr. Davis's health.  (Id. at 29.)   Nurse Cincotti did not recall checking Mr. Davis's lab results or calling a physician for advice on how to treat Mr. Davis because he "seemed stable," and was "alert," "oriented," and "making sense."   (Id. at 23–24, 29, 33.)

Deputy Tibai and Deputy Hutto were assigned to the medical floor at the Core Facility on the night of October 17, 2017 and the morning of October 18, 2017. (Doc. 86-1 at 8, 27.)   Deputy Tibai's responsibility included the safety and control of the inmates at the Core Facility, which includes advising the nursing staff of any medical issues the inmates have.  (Id. at 7–9.)   Deputy Tibai had no medical training "other than CPR."  (Id. at 9–10.)   Deputies at the Lee County Jail are not advised of any medical conditions of the inmates.  (Id. at 12–14, 20.)

Deputy Tibai does not recall having any interaction with Mr. Davis prior to October 17, 2017.  (Id. at 14.)   Sometime around 11:00 p.m. that night, Mr. Davis first complained to Deputy Tibai "that he didn't feel good and that he wanted to go to the hospital."  (Id. at 18, 21.)   Deputy Tibai asked him if he "was having chest pains, and he said, 'No,'" so Deputy Tibai "went and got the medical staff."  (Id. at

23.)   Deputy Tibai assumes that Deputy Hutto was also "probably on the floor" at the time.   (Id. at 20.)   Deputy Hutto was present with Deputy Tibai when a nurse spoke with Mr. Davis, took vitals, and checked "all his appendages to make sure there was no scrapes, cuts or bruises on him."   (Id. at 21, 24–25, 27.)   At the end of the evaluation, the nurse told Deputy Tibai "everything was ok and that we're good to go."   (Id. at 26.)

Deputy Tibai made rounds approximately every 30 minutes, and he recalls that Mr. Davis complained to him about not feeling well "multiple" and "more than five, less than ten" times.   (Id. at 28–29.)   Each time Mr. Davis complained to him, Deputy Tibai advised medical staff who would enter Mr. Davis's cell and take his vitals.   (Id. at 25, 28–29, 33.)   Other inmates waved down Deputies Tibai and Hutto during the night.   (Id. at 33.)   Deputy Tibai also recalled that Mr. Davis said he vomited one time "[l]ater in the night" and on another occasion was lying on the floor.   (Id. at 30.)   When Deputies Tibai and Hutto found Mr. Davis lying on the floor, they assisted him to his bed, medical staff was informed, and Mr. Davis made no complaints.   (Id. at 31.)   At no time did Mr. Davis complain about chest pain. (Id. at 30.)

At approximately 3:00 or 4:00 a.m. on October 18, 2017, the dialysis nurse came to take Mr. Davis for dialysis, but he said he did not want to go and asked to be taken to the hospital.   (Id. at 49.)   Deputy Tibai left his shift at 5:00 a.m.   (Doc. 86-1 at 37.)   Prior to the shift change, Deputy Tibai did "one more visual check" but does not recall whether Mr. Davis was awake or made any complaints.   (Id.)

4

Deputy Tibai notified "the two deputies that were coming on about the issues with Mr. Davis," including that "Mr. Davis complained quite a bit, . . . had the nursing staff in there multiple times and he refused his dialysis." (Id. at 37–39.)   Nurse Cincotti left her shift "at roughly 6:00 a.m."   (Doc. 85-1 at 30.)

At approximately 6:30 a.m., Nurse Natasha Vargas came on duty and contacted a physician to conduct an assessment of Mr. Davis.   (Doc. 50 at 7, ¶¶ 45–49.)   The physician instructed medical staff to have Mr. Davis transported to a hospital.   (Id. at ¶ 50.)   According to medical records, at approximately 8:00 a.m. Mr. Davis was transported to the Gulf Coast Hospital where he complained of shortness of breath and was hypoactive but was noted to be in no distress, had a blood pressure of 100/60, and was oriented to time, place, and self.   (Id. at 7, ¶ 52; Doc. 82-3 at 4; Doc. 90-1 at 3; Doc. 82-6 at 3; Doc. 82-7 at 3.)   He went into cardiac arrest and died at 10:22 a.m.   (Doc. 50 at 8, ¶ 56; Doc. 82-2 at 1.)   According to the coroner's report, Mr. Davis died of an acute myocardial infarction due to hypertensive and atherosclerotic cardiovascular disease.   (Doc. 82-2 at 1.)

The Estate raises several claims: a violation of 42 U.S.C. § 1983 premised on a purported violation of Mr. Davis's "Fourteenth Amendment rights to due process by failing to provide Davis with such basic necessities as medical care" and deliberate indifference against Deputy Hutto (Count I), Deputy Tibai (Count II), and Nurse Cincotti (Count III), (Doc. 50 at ¶¶ 69, 81, 93); a section 1983 claim against the Sheriff, alleging that "Hutto, Tibai and Cincotti . . . were acting in accordance with [the] Sheriff's policies or customs" (Count IV), (id. at ¶¶ 105, 108–

09); and a cause of action styled "wrongful death (negligence)" against the Sheriff, alleging that he breached various duties relating to Mr. Davis's medical care (Count V), (id. at ¶¶ 113–16).[2]

In essence, Plaintiffs allege that Mr. Davis was not provided the medical treatment that he needed and, as a result, died of sepsis.   (Doc. 50 at ¶¶ 25–27, 40, 52–57.)   They offer the expert opinion of Sumeet Shetty, M.D., who opines that "the interventions taken at the hospital would have been more effective in preserving Mr. Davis' life had he been transported to the hospital when he initially made complaints and requested to be transported to the hospital, at a minimum, on the evening of 10/17/17."   (Doc. 90-1 at 4.)   He further opines that Mr. Davis arrived at the hospital "with a diagnosis of metabolic anion gap acidosis, secondary to acute renal failure, acute myocardial infarction and likely sepsis."   (Id. at 3.)   Dr. Shetty notes that he "would like to review the cultures drawn" in the hospital, but there is no indication that he has done so.   (Id.)

Defendants offer the expert opinion of Chad Zawitz, M.D., who observes that although sepsis "was in fact considered," there were no "clinical, radiologic, or autopsy findings indicating any source of infection," and the "microbiology reports

---

[2] The Estate previously brought section 1983 claims premised on purported violations of Mr. Davis's Fourth and Eighth Amendment rights and "wrongful death (negligence)" claims against Defendants Hutto, Tibai, and Cincotti.   (Docs. 1, 27.) Those claims were not included in the Estate's second amended complaint, the operative complaint in this case.   (Doc. 50.)   Any claims not included in the second amended complaint are not properly before the Court.   See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

from the cultures obtained on 10/18/17 showed no growth of bacteria, ruling out a systemic bloodstream infection and sepsis." (Doc. 82-7 at 4–5.) Defendants also offer the expert opinion of Paul Adler, D.O., who opines that Mr. Davis did not die of sepsis, and that the staff at Lee County Jail was not deliberately indifferent to Mr. Davis's medical needs because, among other things, he was seen for his vital signs and complaints, and low blood pressure readings are "not uncommon in a patient with [end-stage renal disease] on dialysis." (Doc. 82-6 at 3–4.)

Defendants have moved for summary judgment on all counts. (Doc. 82.) The Estate responded in opposition (Doc. 91), and Defendants filed a reply (Doc. 92).

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If this showing is made, "the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial." Shaw v. City of Selma, 884 F.3d 1093, 1098 (11th Cir. 2018) (quotation omitted). "A fact is 'material' if it has the potential of 'affect[ing] the outcome' of the case." Id. (citation omitted). "And to raise a 'genuine' dispute, the nonmoving party must point to enough evidence that 'a reasonable jury could return a verdict for [him].'" Id. (citation omitted). "When considering the record on summary judgment 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Id. (citation omitted). "[A]n inference is

not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1324 (11th Cir. 1982) (quotation omitted).

## DISCUSSION

Summary judgment is warranted in Defendants' favor on each count. The Court will address the Estate's claims in turn.

### Count I: Section 1983 Claim Against Deputy Hutto

Summary judgment is warranted in Deputy Hutto's favor on the Estate's section 1983 claim raised in Count I. As to each of the individual defendants, the Estate alleges that they "violated Davis' Constitutional rights by remaining deliberately indifferent to Davis' serious medical needs and by failing to provide Davis proper medical care while Davis was detained in the Lee County Jail, including having Davis transported to a hospital," and that as a "direct result of [their] actions, Plaintiff has suffered damages." (Doc. 50 at ¶¶ 72, 78, 84, 90, 96, 102.)

Pretrial detainees have a right to adequate medical care under the Due Process Clause of the Fourteenth Amendment. Hamm v. DeKalb Cnty., 774 F.2d 1567, 1574 (11th Cir. 1985). The minimum standard of medical care required by the Due Process Clause is identical to the standard for convicted persons under the Eighth Amendment. Id. Accordingly, to prevail on a section 1983 claim for inadequate medical care, a pretrial detainee must demonstrate that jail officials acted with deliberate indifference to the detainee's medical needs. Goebert v. Lee

Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).   "To survive summary judgment in a case alleging deliberate indifference, a plaintiff must 'produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'"   Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003)).

"A deliberate-indifference claim has two components: an objectively serious medical need, and subjective deliberate indifference to that need."   Hannah v. Armor Corr. Health Servs. Inc., 792 F. App'x 742, 744 (11th Cir. 2019) (citing Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004)).   "An objectively serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"   Id. (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).   Subjective deliberate indifference requires: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence."   Id. at 744–45 (quoting Brown, 387 F.3d. at 1351).

"An official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay."   Goebert, 510 F.3d at 1330 (quotation omitted).   "[M]edical treatment violates the Constitution only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to

9

fundamental fairness." <u>Nam Dang by and through Vina Dang v. Sheriff, Seminole Cnty. Fla.</u>, 871 F.3d 1272, 1280 (11th Cir. 2017) (quotation omitted).

The Estate has not made this showing as to Deputy Hutto or any other defendant.   First, the evidence does not establish either an objectively serious medical need or disregard of any risk of serious harm by conduct that is more than negligence by Deputy Hutto.

As an initial matter, it is unclear what the Estate contends is the serious need that had been diagnosed by a physician as mandating treatment or was so obvious that even a lay person would easily recognize the necessity for a doctor's attention.   <u>See</u> <u>Hannah</u>, 792 F. App'x at 744.   To the extent the Estate contends the medical need was related to Mr. Davis's dialysis treatment, Mr. Davis was receiving dialysis at the jail.   (Doc. 50 at 4, ¶ 20; Doc. 85-1 at 19.)[3]   To the extent the Estate contends the medical need was related to Mr. Davis's heart condition, the Estate has not identified evidence showing that any personnel at the Lee County Jail was aware of the full extent of Mr. Davis's pre-existing condition or that he

---

[3] The Estate alleges that "[d]espite Defendants' knowledge of Davis' serious medical conditions and the risks, related thereto, once Davis was in Sheriff's custody, Sheriff's staff and physicians substantially decreased the frequency and duration of Davis' dialysis," and that "Sheriff and his medical staff knew or should have known that a decrease in the frequency and duration of Davis' dialysis would have serious, and ultimately fatal, consequences, as same could lead to other serious medical conditions, including sepsis."   (Doc. 50 at 4, ¶¶ 24–25.)   The Estate does not raise this issue in its opposition to summary judgment or offer any evidence supporting the allegation in its unsworn complaint.   <u>See</u> <u>Caldwell v. Warden, FCI Talladega</u>, 748 F.3d 1090, 1098 (11th Cir. 2014) ("We also credit the 'specific facts' pled in plaintiff['s] <u>sworn</u> complaint when considering his opposition to summary judgment." (emphasis added)).

complained of chest pain to any defendant on October 17 or 18, 2017.[4]

To the extent the Estate contends the serious medical need was based on Mr. Davis's purported symptoms of sepsis, the record belies the contention. Indeed, the Estate does not support the allegation in its unsworn complaint that Mr. Davis "complained to Sheriff's staff of nausea, extreme pain and shortness of breath, all of which are signs of sepsis." (Doc. 50 at 4, ¶ 26.) First, the Estate does not identify evidence showing that these complaints were made to any defendant. (See, e.g., Doc. 85-1 at 25 (not recalling complaints of "shortness of breath").)[5] Second, there is no evidence suggesting that these are, in fact, symptoms of sepsis, or that, even assuming sepsis occurred, the sepsis presented a serious medical need. At most,

---

[4] The Estate alleges that the "Sheriff was aware of Davis' medical conditions, because after he was taken into the custody . . . the medical staff conducted a medical evaluation of Davis, had labs performed, and reviewed Davis' medical history." (Doc. 50 at 4, ¶ 21.) This unsupported allegation in an unsworn complaint appears to be refuted by records reflecting that Mr. Davis did not notify the jail staff about his complete cardiac medical history. (Doc. 82-6 at 4.) Indeed, records describing a "list of encounters Mr. Davis had with medical staff" reflect that a "mental health intake screening" and "intake health screening" were conducted, neither of which revealed an extensive history of heart problems. (Doc. 82-3 at 1; see also Doc. 85-1 at 11–12.) It is not clear who wrote the content of each entry in the "list of encounters," the content of which the Estate does not challenge. In all events, summary judgment in Defendants' favor is warranted even without consideration of the records of Lee County Jail or Gulf Coast Hospital.

[5] Dr. Shetty asserts that at 1:00 a.m. on October 18, 2017, Mr. Davis was "found by jail personnel on the floor next to his bed complaining of shortness of breath." (Doc. 90-1 at 3; see also Doc. 82-7 at 4 (asserting that Mr. Davis had complained about shortness of breath and labored breathing).) This assertion is not supported by the deposition testimony of Nurse Cincotti or Deputy Tibai, or any other identified record evidence. (See Doc. 91 at 8 (citing only Dr. Shetty's report and deposition testimony)). In all events, even if true, the Estate has not established that any defendant was aware of this complaint, and summary judgment is nonetheless warranted in Defendants' favor on all claims.

the Estate's expert opined that Mr. Davis arrived at the hospital "with a diagnosis of metabolic anion gap acidosis, secondary to acute renal failure, acute myocardial infarction and likely sepsis." (Doc. 90-1 at 3.)[6]

Finally, the symptoms themselves presented no medical emergency that would have been obvious to a lay person. As reflected in the record evidence, during visits with medical staff, Mr. Davis was stable, alert, oriented, and "making sense." (Doc. 85-1 at 33.) As Nurse Cincotti testified, during her multiple interactions with Mr. Davis, she did not recall him complaining about any particular health conditions, much less conditions that would clearly require immediate attention. (Id. at 17–18.) As to Mr. Davis lying on the ground, there was no indication that immediate medical attention was necessary. The Estate has not refuted Nurse Cincotti's testimony that "there was no injury. And those cots are really narrow. I've seen people with two full legs roll off them." (Id. at 27.) And although Mr. Davis's blood pressure was "a little low," the Estate has not refuted Nurse Cincotti's testimony that "some people's blood pressures just live low," (id.), or Dr. Adler's opinion that a low blood pressure reading is "not

---

[6] Although Dr. Shetty notes that he "would like to review the cultures drawn" in the hospital, there is no indication that he has done so. (Doc. 90-1 at 3.) Notably, the coroner found that Mr. Davis died of an acute myocardial infarction due to hypertensive and atherosclerotic cardiovascular disease, not sepsis. (Doc. 82-2 at 1.) Further, Dr. Shetty's opinion does not expressly contradict Dr. Zawitz's opinion that although sepsis "was in fact considered," there were no "clinical radiologic, or autopsy findings indicating any source of infection," and that the "microbiology reports from the cultures obtained on 10/18/17 showed no growth of bacteria." (Doc. 82-7 at 4–5; see also Doc. 82-6 at 3.) In all events, even assuming sepsis occurred, the Estate has not established deliberate indifference.

uncommon in a patient with [end-stage renal disease] on dialysis," (Doc. 82-6 at 3).

Instead, the Estate fails to present any evidence indicating that Mr. Davis's blood

pressure readings should have alerted medical staff to take additional measures.

See Nam Dang, 871 F.3d at 1280–83 (finding no deliberate indifference where

medical staff was responsive to complaints and provided treatment deemed

appropriate at the time, despite failure to properly diagnose based on symptoms);

Farmer v. Brennan, 511 U.S. 825, 838 (1994) (finding no liability for "an official's

failure to alleviate a significant risk that he should have perceived but did not").

According to records, even when Mr. Davis refused dialysis, there were "[n]o

signs of acute distress noted."   (Doc. 82-3 at 4.)[7]   Nor were there signs of acute

distress when he was transported to the hospital via emergency medical services.

(Doc. 82-6 at 3; Doc. 82-7 at 3.)   These circumstances are unlike cases in which a

serious medical condition is ignored over a period of days.   See, e.g., Goebert, 510

F.3d at 1327.[8]   And although "shorter delays may also constitute a constitutional

---

[7] This interaction is the final recorded entry in the list of encounters Mr.
Davis had with medical staff prior to being transported to a hospital.   (Doc. 82-3.)
The entry states as follows:

> 10/18/2017 at 04:30 Mr. Davis refused dialysis; Potential
> consequences explained.   Patient still refusing and
> refusal signed by medical and deputy.   No signs of acute
> distress noted.   Will continue to monitor.

(Id. at 4.)   As noted, summary judgment in Defendants' favor is warranted even
without consideration of these or Gulf Coast Hospital's records.

[8] Dr. Shetty and Dr. Zawitz assert that Mr. Davis had raised various
complaints in the days leading up to October 17, 2017.   (Doc. 90-1 at 3; Doc. 82-7 at
4.)   This assertion is not supported by the deposition testimony of Nurse Cincotti or
Deputy Tibai, or any other identified record evidence.   In all events, the Estate has
not established that any individual defendant was aware of such complaints or that,

violation if injuries are sufficiently serious," the Estate has not established that any defendant had reason to know the life-threatening condition that was purportedly exacerbated by delay.   See Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010). In short, based on Mr. Davis's symptoms, the Estate has not established that a lay person would have easily recognized the necessity for a doctor's attention prior to him being transported to the hospital.

As to the subjective component of a deliberate indifference claim, the Estate has not established that Deputy Hutto had a subjective knowledge of a risk of serious harm and disregarded that risk by conduct that is more than mere negligence.   See Hannah, 792 F. App'x at 744.   Indeed, no party presents testimony from Deputy Hutto indicating what she knew or did not know on October 17 and 18, 2017.   See Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual Defendant must be judged separately and on the basis of what that person knows." (citations omitted)).

In all events, assuming Deputy Hutto accompanied Deputy Tibai during each visit to Mr. Davis and was aware of the same information, based on the information known to her and the symptoms displayed by Mr. Davis, she did not have knowledge of a risk of serious harm.   See Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) ("Plaintiffs have presented no evidence that indicates that the deputies were aware of the serious risk of harm that a delay in treatment could

---

even if they were aware, Defendants were deliberately indifferent as to Mr. Davis.

cause[] [the decedent]—an essential element of a deliberate indifference claim."). And rather than disregard any risk, each time Mr. Davis complained to Deputy Tibai, medical staff was summoned.   (Doc. 86-1 at 25, 28–29, 33.)   Finally, even assuming Deputy Hutto could have taken additional measures to reduce risk, the Estate has not shown that her conduct constituted more than mere negligence.   See Hannah, 792 F. App'x at 744.

Nor has the Estate established causation as to Deputy Hutto.   See Goodman, 718 F.3d at 1331; Mann, 588 F.3d at 1306–07 (requiring "causation between that indifference and the plaintiff's injury").   Instead, the only evidence the Estate sets forth is an expert's opinion that "the interventions taken at the hospital would have been more effective in preserving Mr. Davis' life had he been transported to the hospital when he initially made complaints and requested to be transported to the hospital, at a minimum, on the evening of 10/17/17."   (Doc. 90-1 at 4 (emphasis added.)   Dr. Shetty does not explain why the interventions would have been "more effective" or what else Defendants could have done in caring for Mr. Davis.

In fact, the Estate alleges only once—in its general allegations—that the "delay in care, caused by LSCO's deliberate indifference to Davis' serious medical condition caused Davis' death."   (Doc. 50 at 8, ¶ 58 (emphasis added.)   Apart from generalized allegations that "[a]s a direct result of [the defendants'] actions, Plaintiff has suffered damages," there is no allegation that the actions or inactions of any individual defendant caused Mr. Davis's death.   (Doc. 50 at ¶¶ 78, 90, 102 (emphasis added.)

In sum, absent evidence of Deputy Hutto's deliberate indifference to Mr. Davis's medical needs, summary judgment is warranted in her favor on Count I.

**Count II: Section 1983 Claim Against Deputy Tibai**

Summary judgment is also warranted as to the Estate's section 1983 claim against Deputy Tibai.   As with Count I, the evidence does not establish either an objectively serious medical need or disregard of any risk of serious harm by conduct that is more than negligence by Deputy Tibai.

As noted, based on the information known to Deputy Tibai and the symptoms displayed by Mr. Davis, Deputy Tibai did not have knowledge of a risk of serious harm.   And rather than disregard any risk, each time Mr. Davis complained to Deputy Tibai, medical staff was summoned.   (Doc. 86-1 at 25, 28–29, 33.)   Further, prior to finishing his shift at 5:00 a.m., Deputy Tibai did "one more visual check" and notified "the two deputies that were coming on about the issues with Mr. Davis," including that "Mr. Davis complained quite a bit, . . . had the nursing staff in there multiple times and he refused his dialysis."   (Id. at 37–39.)

Even assuming Deputy Tibai could have done more to reduce any risk, the Estate has not shown that his conduct was more than mere negligence, which does not equate to deliberate indifference.   Hannah, 792 F. App'x at 744.   Nor has the Estate established causation as to Deputy Tibai.   Summary judgment is warranted in Deputy Tibai's favor on Count II.

**Count III: Section 1983 Claim Against Nurse Cincotti**

Summary judgment is also warranted as to the Estate's section 1983 claim against Nurse Cincotti.   As with Deputies Hutto and Tibai, Mr. Davis complained to Nurse Cincotti about feeling ill and did not raise any specific complaints.   (Doc. 85-1 at 16–17.)   Nurse Cincotti did recall that, based on his records, Mr. Davis had kidney disease and was a dialysis patient, and that nurses checked his blood pressure, which was "a little low."   (Id. at 18–19.)   Further, she was aware that during her lunch break Mr. Davis was found lying on the floor.   (Id. at 26–27.) Nurse Cincotti did not recall checking Mr. Davis's lab results or calling a physician for advice on how to treat Mr. Davis because he "seemed stable," and was "alert," "oriented," and "making sense."   (Id. at 23–24, 29, 33.)[9]

---

[9] To the extent the Estate challenges Nurse Cincotti's "medical opinion" as to Mr. Davis, a mere "difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment fails to support a claim of cruel and unusual punishment."   Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1273 (11th Cir. 2020) (brackets omitted); Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[T]he question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." (quoting Estelle, 429 U.S. at 107)).

As a result of the events giving rise to the Estate's claims, Nurse Cincotti left her role as charge nurse at the Core Facility.   The Estate asserts that Nurse Cincotti was "fired from her position as charge nurse for her inaction in responding to Mr. Davis' medical condition(s)."   (Doc. 91 at 8–9.)   The cited evidence, however, does not clearly support the assertion.   Instead, Nurse Cincotti testified as follows:

> Q:    What caused you to leave that role that you had back
>        in October of 2017?
> A:    The events in question.
> Q:    Was that something that you left voluntarily, or is
>        that something that you were terminated by your
>        employer?
> A:    It's hard to say, because of the way everything
>        happened.

While the claim raised against Nurse Cincotti presents a closer call, ultimately and for the reasons noted above, the Estate has failed to establish either an objectively serious medical need or disregard of any risk of serious harm by conduct that is more than mere negligence by Nurse Cincotti.   As with the other individual defendants, the Estate has also failed to establish that Mr. Davis's injuries and death were caused by Nurse Cincotti's actions.   Accordingly, summary judgment in her favor on Count III is warranted.

**Count IV: Section 1983 Claim Against the Sheriff**

Next, summary judgment is warranted as to the Estate's section 1983 claim against the Sheriff.   The Estate raises Count IV against the Sheriff "for violating Davis' Fourteenth Amendment rights by failing to provide Davis with such basic necessities as medical care," alleging that "Davis was denied proper medical care at the hands of Hutto, Tibai and Cincotti who were acting in accordance with Sheriff's policies or customs."   (Doc. 50 at 13–14, ¶¶ 105, 108.)   As to the specific policy or custom at issue, the Estate alleges "[i]t is Sheriff's policy or custom to have his correctional officers and staff persons remain deliberately indifferent to the serious

---

Q:     Regardless, it was the events of this case that led to you leaving that job?

A:     Yes.

(Doc. 85-1 at 8–9.)   However, even interpreting this testimony in a light most favorable to the Estate to mean that Nurse Cincotti was fired, the deliberate indifference claim nevertheless fails.

medical needs of the inmates entrusted to his care in his jail facilities." (Id. at 14, ¶ 109.)  This claim fails for several reasons.[10]

To prevail on a section 1983 claim against the Sheriff, the Estate must show: (1) a violation of Mr. Davis's constitutional rights; (2) a custom or policy that was deliberately indifferent to that constitutional right; and (3) a causal link between that policy or custom and the violation.  See Sharp v. City of Huntsville, Ala., 730 F. App'x 858, 860 (11th Cir. 2018); see also Davies v. Israel, 342 F. Supp. 3d 1302, 1309 (S.D. Fla. 2018).

First, as noted, the Estate has not shown a violation of Mr. Davis's constitutional rights.  Second, the Estate has not identified the relevant custom or policy of the Sheriff supporting this section 1983 claim, much less shown a custom or policy that was deliberately indifferent to Mr. Davis's constitutional rights.  The Estate's general allegation that the individual defendants "were acting in accordance with Sheriff's policies or customs," and "[i]t is Sheriff's policy or custom to have his correctional officers and staff persons remain deliberately indifferent to

---

[10] Despite Defendants' contention that summary judgment is warranted in their favor as to all counts absent deliberate indifference or a deviation in the standard of care, the Estate did not address the merits of its section 1983 claim against the Sheriff.   As a result, the Estate's claim in Count IV is deemed abandoned, but will nonetheless be addressed.   See Edmondson v. Bd. of Trs. of Univ. of Ala., 258 F. App'x 250, 253 (11th Cir. 2007) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); Richards v. Cobb Cnty., 487 F. App'x 556, 557 n.1 (11th Cir. 2012) ("[Plaintiff] also alleged a claim for malicious prosecution . . . but he then abandoned that claim by failing to argue it in response to the [defendant's] motion for summary judgment . . . .").

the serious medical needs of the inmates entrusted to his care in his jail facilities" is insufficient.   (Doc. 50 at 13–14, ¶¶ 108–09.)

Construing the Estate's claim, albeit generously, as alleging a policy of delaying hospital transport of detainees who require emergency medical care, and even putting aside the fact that Nurse Cincotti was an employee of Armor, there is no evidence supporting a finding that such a policy exists.   The Estate's allegations in its unsworn complaint are insufficient.   Further, the Estate fails to set forth evidence of any other instance of similar, purportedly unconstitutional conduct by the Sheriff or the LCSO.   See Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310–12 (11th Cir. 2011) (collecting cases and rejecting policy claim where plaintiff relied only on his own experience).   There is, in other words, no evidence that the events giving rise to the Estate's claims are anything other than an isolated incident and not pursuant to a policy or custom of the Sheriff.   This is true even though the incident involved more than one employee or agent of the Sheriff.   See id. at 1311 ("A single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees of the municipality.").

Additionally, as with the section 1983 claims against the individual defendants, the Estate has failed to establish that any policy or custom of the Sheriff caused the violation of Mr. Davis's constitutional rights or his injuries. See Goodman, 718 F.3d at 1336.   Accordingly, summary judgment in the Sheriff's favor on Count IV is warranted.

**Count V: "Wrongful Death (Negligence)" Claim against the Sheriff**

In Count V, the Estate alleges that the Sheriff "owed a duty of reasonable care to Davis to provide a safe environment and medical treatment while Davis was in Sheriff's custody," and that the Sheriff, "through his agents and employees," breached this duty by failing to provide medical care, recognize the severity of Mr. Davis's condition, and transport him to a medical facility or hospital and by delaying medical care.   (Doc. 50 at 15, ¶¶ 114–15.)   Defendants contend summary judgment is warranted on this claim for several reasons.   (Doc. 82 at 20–23.)   The Estate did not respond with any specificity to Defendants' arguments as to its "wrongful death (negligence)" claim.[11]   In all events, summary judgment is warranted in the Sheriff's favor.

Before turning to the merits of the claim, the Court first addresses Defendants' contention that Chapter 766 of the Florida Statutes precludes review of the claim. Chapter 766 of the Florida Statutes "imposes certain notice and presuit screening requirements" on plaintiffs who wish to bring "medical malpractice and medical negligence actions."   J.B. v. Sacred Heart Hosp. of Pensacola, 635 So. 2d 945, 948 (Fla. 1994); see also Fla. Stat § 766.106(2)–(3).   Compliance with these requirements is considered a non-jurisdictional condition precedent for filing a medical malpractice action.   See Ingersoll v. Hoffman, 589 So. 2d 223, 224 (Fla. 1991).   Chapter 766 is limited to claims for "medical negligence" or "medical malpractice," which are defined

---

[11] As a result of this failure to respond to Defendants' arguments, the Estate's claim in Count V is deemed abandoned, but will nonetheless be addressed.

as claims "arising out of the rendering of, or the failure to render, medical care services."   Fla. Stat. § 766.106(1)(a).   "[F]or a claim to sound in medical malpractice, the act from which the claim arises must be directly related to medical care or services, which require the use of professional judgment or skill."   Nat'l Deaf Acad., LLC v. Townes, 242 So. 3d 303, 311 (Fla. 2018).

Despite the Estate styling its claim as "wrongful death (negligence)," the Court agrees with Defendants that because the acts from which the claims arise are directly related to medical care or services, the claim is for medical negligence such that Chapter 766 applies.   (Doc. 82 at 21–23.)   As the complaint alleges, Mr. Davis passed away because the Sheriff breached various duties relating to providing to Mr. Davis timely and adequate medical care.   (Doc. 50 at 15, ¶ 115.)   In other words, the complaint is based on the idea that different decisions relating to the medical care of Mr. Davis by the Sheriff and his "agents and employees" would have potentially ended in a different result.   (Id.)   The Estate's theory would necessarily require the Court to scrutinize the medical decisions made and determine whether they were proper.   Because of this, Count V raises a claim of medical negligence subject to Chapter 766's presuit screening and notice requirements.   (Doc. 82 at 21.)[12]

---

[12] Some Florida courts have distinguished between claims premised on negligent diagnosis, treatment, or care and "ordinary negligence" claims premised on "custodial" duties and obligations to an inmate, finding that only claims that implicate the medical standard of care trigger Chapter 766's requirements. See, e.g., Palms W. Hosp. Ltd. P'ship v. Burns, 83 So. 3d 785, 789–91 (Fla. 4th DCA 2011); Darling v. Palm Beach Cnty. Sheriff, 2 So. 3d 368, 369 (Fla. 4th DCA 2008). The Estate does not raise any allegations relating to custodial negligence in its complaint or present such evidence in its opposition to the motion for summary judgment.   In fact, in response to Defendants' contentions that its "claim should

That said, the Sheriff has waived any defense relating to the Estate's failure to comply with Chapter 766's presuit requirements.   See Ingersoll, 589 So. 2d at 224 (finding that failure to comply with prelitigation notice requirements may be excused by a showing of estoppel or waiver).   It appears that prior to Defendants' motion for summary judgment the issue was raised only once—in Nurse Cincotti's motion to dismiss the Estate's original complaint as a basis to dismiss the negligence claim against her, not the Sheriff.   (Doc. 22.)   The Sheriff did not previously raise the issue in a motion to dismiss or as a defense in his answer.   (Docs. 17, 29, 53, 58.)   And although the Sheriff generally denied the Estate's allegation that "all conditions precedent to bringing this lawsuit have been met, including waiting the requisite pre-suit periods, pursuant to Florida Statute 768.28," courts have held that allegations of compliance with all conditions precedents, including Chapter 766's requirements, must be denied with specificity to avoid waiver.   (Doc. 50 at 15, ¶ 117; Doc. 58 at 7, ¶ 117); see, e.g., Ingersoll, 589 So. 2d at 224; see also Pushko v. Klebener, 399 F. App'x 490, 495 (11th Cir. 2010); Giron v. Loving Care Ret. Servs., Inc., No. 07-23309-CIV, 2009 WL 10712145, at *1 (S.D. Fla. Sept. 15, 2009).   Accordingly, any such defense is waived, and the Court proceeds to the merits of the claim.

---

have been brought under . . . medical malpractice and not ordinary negligence," the Estate simply maintains that Defendants "deviated from the acceptable standard of care."   (Doc. 91 at 1, 7, 9; Doc. 82 at 23.)   In all events, Chapter 766 applies.   See, e.g., Lyles v. Osceola Cnty., No. 6:11-cv-1585-Orl-36, 2012 WL 4052258, at *5 (M.D. Fla. Sept. 13, 2012) (finding that claim premised on failure to timely provide access to vascular physician and emergency medical services constituted claim for medical negligence).   And even if the Estate purports to bring an "ordinary negligence" claim, summary judgment is warranted because the Estate has failed to establish causation.

As noted, the Sheriff's negligence claim is premised on the Sheriff's purported breach of his duty to provide medical care by failing to provide medical care, recognize the severity of Mr. Davis's condition, and transport him to a medical facility or hospital and by delaying medical care.   (Doc. 50 at 15, ¶¶ 114–15.)   Even assuming that the Sheriff can be found liable as a "health care provider" or based on the actions of Armor employees, the Estate has failed to establish either breach or causation. See Fla. Stat. § 766.202(4); Lyles v. Osceola Cnty., No. 6:11-cv-1585-Orl-36, 2012 WL 4052258, at *11 (M.D. Fla. Sept. 13, 2012) (finding that "medical providers in a jail setting are not immune from medical negligence").

As the Florida Statutes provide, "[i]n any action for recovery of damages based on the death or personal injury of any person in which it is alleged that such death or injury resulted from the negligence of a health care provider as defined in [section] 766.202(4), the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider."   Fla. Stat. § 766.102(1).   Additionally, "[t]he existence of a medical injury does not create any inference or presumption of negligence against a health care provider, and the claimant must maintain the burden of proving that an injury was proximately caused by a breach of the prevailing professional standard of care by the health care provider."   Fla. Stat. § 766.102(3)(b).

Here, the Estate's expert evidence does not support a finding that the medical care rendered to Mr. Davis deviated from the prevailing standard of care.   Dr. Shetty

merely opines that "the interventions taken at the hospital would have been more effective in preserving Mr. Davis' life had he been transported to the hospital when he initially made complaints and requested to be transported to the hospital, at a minimum, on the evening of 10/17/17."   (Doc. 90-1 at 4.)   Tellingly, and unlike Dr. Adler (Doc. 82-6 at 3), Dr. Shetty offers no opinion as to the prevailing standard of care or whether any defendant's conduct meets or does not meet that standard.

Courts have found such a failure to provide expert testimony establishing a deviation from the prevailing standard of care fatal for medical negligence claims. See, e.g., Jerrett v. United States, No. 5:20-cv-134-KKM-PRL, 2022 WL 599200, at *2 (M.D. Fla. Feb. 11, 2022) (collecting cases); Cagle v. United States, No. 3:15-cv-0350-J-20JBT, 2017 WL 6368249, at *3 (M.D. Fla. Aug. 3, 2017), aff'd, 738 F. App'x 633 (11th Cir. 2018).   And even if common sense suffices to show what the standard of care required, for the same reasons that the Estate has failed to establish that any individual defendant was deliberately indifferent to Mr. Davis's medical needs, the Estate has not proved by the greater weight of evidence that the actions of the Sheriff or his employees or agents constituted a breach of the prevailing professional standard of care.   See Fla. Stat. § 766.102(1).

Moreover, even assuming there was a breach, the Estate has not shown that Mr. Davis's injury was proximately caused by any breach.   See Fla. Stat. § 766.102(3)(b).   At the summary judgment stage, the Estate's unsupported allegation in its unsworn complaint that "[a]s a direct and proximate result of such breaches by Sheriff, Davis' condition worsened, eventually leading to his death" is insufficient.

(Doc. 50 at 15, ¶ 116.)   As with the claims analyzed above, the only evidence the Estate sets forth is an expert's opinion that "the interventions taken at the hospital would have been <u>more effective</u> in preserving Mr. Davis' life had he been transported to the hospital when he initially made complaints and requested to be transported to the hospital, at a minimum, on the evening of 10/17/17."   (Doc. 90-1 at 4 (emphasis added).)   This is also insufficient.   <u>See</u> <u>Shartz v. Miulli</u>, 127 So. 3d 613, 618 (Fla. 2d DCA 2013) ("[A] plaintiff in a medical malpractice action must show more than a decreased chance of survival because of a defendant's conduct. . . . [T]he plaintiff must show that what was done or failed to be done probably would have affected the outcome." (quoting <u>Gooding v. Univ. Hosp. Bldg., Inc.</u>, 445 So. 2d 1015, 1020 (Fla. 1984)); <u>see also</u> <u>Chaskes v. Gutierrez</u>, 116 So. 3d 479, 487–88 (Fla. 3d DCA 2013) (collecting cases).   In short, summary judgment in the Sheriff's favor on Count V is warranted.

## CONCLUSION

Defendants' Motion for Summary Judgment is **GRANTED**.   (Doc. 82.)   The Clerk is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff, to terminate any pending deadlines and motions, and to close the file.

**ORDERED** in Fort Myers, Florida on April 18, 2022.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE